# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1336
_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Southern |
| Blaine Lee Willey, | * | District of Iowa. |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: October 21, 2003

Filed: December 2, 2003

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

In this case the government appeals a downward departure granted by the district court. Blaine Lee Willey was convicted by a jury of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. After imposing a two level sentencing enhancement for obstruction of justice and declining to credit Willey for acceptance of responsibility, the district court departed downward and sentenced him to 60 months. We reverse and remand.

Willey distributed cocaine in Iowa City, Iowa from approximately June 1997 to October 1998. He received cocaine on a weekly basis from Mark Murphy, a Chicago dealer, and supplied it to Thomas Kaut for redistribution. Willey usually supplied Kaut with approximately two to four grams of cocaine each week and charged him roughly $800 per half ounce of cocaine. Most of the transactions occurred at Kaut's home. Some were witnessed by Tim Anding, a government informant who purchased cocaine from Kaut which he had obtained from Willey. The laboratory analysis of the three purchases Anding made from Kaut showed that they involved approximately 4.8, 5.41, and 2.05 grams of cocaine. Willey also used his place of business in Cedar Rapids to conduct drug transactions, and he sold cocaine to Kaut there on at least three occasions. When Mark Murphy was arrested and imprisoned on a drug charge in June 1998, his brother Scott became Willey's source of cocaine. Willey bought approximately 1 to 1.5 ounces of cocaine from Scott Murphy on at least four occasions after Mark went to prison.

Willey's wife learned he was using cocaine in late 1998. She confronted him about it and gave him an ultimatum to stop using drugs. Shortly thereafter, Willey quit using cocaine and voluntarily separated himself from the Iowa City drug scene.

The FBI investigated Willey in March 2000. Willey told an investigating agent that he had purchased and used cocaine in Iowa City two years before but that he had since stayed away from the drug scene. He did not reveal that he had sold cocaine, however. The reason he gives for not having provided information on his drug dealing or for not assisting the federal investigation is that he feared for his life. Willey had no further contact with law enforcement until he was indicted and arrested in April 2002.

At trial, Thomas Kaut, Mark Murphy, and Tim Anding testified as to Willey's involvement in cocaine distribution. Their testimony was corroborated by pen registers, wire interception of several phone calls between Willey and Kaut, and

surveillance of Kaut's home. Willey also testified. He admitted to knowing both Kaut and Mark Murphy, but denied knowing Scott Murphy. He claimed that he had merely purchased small quantities of cocaine from Kaut for his own personal use. He also testified that his phone calls with Kaut dealt with real estate, not cocaine. This testimony was in direct conflict with evidence showing that the phone conversations were not about real estate, and Kaut, Murphy, and Anding all testified that they never saw Willey use any cocaine. At the conclusion of the trial, the jury found Willey guilty of conspiracy to distribute 500 grams or more of cocaine.

Because of the amount of cocaine the jury attributed to Willey, his base offense level under the federal sentencing guidelines was 26. The district court imposed a two level enhancement for obstruction of justice under § 3C1.1 because Willey had testified falsely at trial. See United States Sentencing Guidelines Manual, § 3C1.1 (2002) [USSG]. The court declined to grant an acceptance of responsibility adjustment under USSG § 3E1.1. Willey sought a downward departure for post offense conduct and minor participation in the drug conspiracy. See USSG § 5K2.0; § 3B1.2.

At the sentencing hearing, the district court addressed possible bases for departing downward. The court stated that it could not grant a downward departure "with regard to the post offense conduct in connection with that being an offshoot of acceptance of responsibility." Sentencing Transcript at 26. Willey had been given an opportunity long before trial to accept responsibility by pleading guilty and cooperating with law enforcement officials, but he chose not to do so. The district court also denied Willey's request for a downward departure for minor participation on the basis that such a departure would only be appropriate if he had played a small role in the transactions, such as that of a carrier.

The district court asked the parties to address whether the overall circumstances removed Willey's case from the heartland so as to warrant a downward

departure. The government argued that Willey's case was not so exceptional as to be outside the heartland because he failed to assist the FBI with its investigation and to accept responsibility and he testified falsely at trial. The government stated that he should not be able to benefit just because he had not been prosecuted closer to the time of his drug offense, and a downward departure would undermine the enhancement for obstruction of justice. The government requested that he be sentenced at the low end of the guideline range to 78 months. Willey stated that he had not misled or obstructed the FBI investigation but had declined to assist the prosecution because of a genuine fear for his life. He also argued that he had dramatically altered his lifestyle by ending his drug habit and separating himself voluntarily from the Iowa City drug scene. Thirty four letters in his support were submitted from various individuals.

The district court granted a downward departure under USSG § 5K2.0 on the ground that Willey's circumstances took him outside the heartland of cases. The court cited a number of discouraged guideline factors, including Willey's relationship with his wife, educational achievement, professional success, and community status. It ruled that these factors taken together with his voluntary drug rehabilitation removed his case from the heartland. The government appeals the departure. It contends that a downward departure was not warranted because Willey had obstructed justice and did not accept responsibility and the court relied on factors discouraged by the guidelines. Willey counters that his voluntarily giving up drugs two years prior to any contact with law enforcement officials and that his good standing in the community for the past few years merited the departure.

Under the PROTECT Act, 18 U.S.C. § 3742(e) as amended by § 401(d) of the Act, 108 Pub. L. 21, 117 Stat. 650, 670, April 30, 2003, we review de novo the application of the guidelines to the facts and review the district court's factual findings for clear error. United States v. Gonzales-Ortega, 346 F.3d 800, 801 (8th Cir. 2003); United States v. Hutman, 339 F.3d 773, 775 (8th Cir. 2003); United States

-4-

v. Aguilar-Lopez, 329 F.3d 960, 962 (8th Cir. 2003). This standard of review applies even though Willey was sentenced before the Act became law because it is procedural in nature. Hutman, 339 F.3d at 775. Unless otherwise barred, a court may depart from the sentencing guidelines if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b); see also USSG § 5K2.0.

Downward departures for exceptional post offense conduct have been approved where a defendant has demonstrated a fundamental change in attitude by genuinely accepting responsibility for his crimes, ending all criminal activity, and radically altering his lifestyle. See United States v. DeShon, 183 F.3d 888, 890 (8th Cir. 1999); United States v. Kaptizke, 130 F.3d 820, 823 (8th Cir. 1997). Although Willey undoubtedly altered his lifestyle by ending his drug use, the district court's finding that he obstructed justice by testifying falsely at his trial was not clearly erroneous. That finding shows that Willey's post offense rehabilitation was not sufficient to prevent his violating the law by giving false testimony. "The touchstone of extraordinary rehabilitation is a fundamental change in attitude." United States v. Craven, 239 F.3d 91, 99 (2d Cir. 2001). Willey was also not forthcoming earlier when the FBI questioned him about his connection to drugs. We conclude that Willey's rehabilitation record was not sufficient to support a downward departure.

The question then is whether the fact that Willey had ended his drug use could be combined with the several discouraged factors relied on by the district court to support a downward departure. The court relied on Willey's professional credentials as an engineer, his college education, and the support of his wife and family. These factors have been specifically considered by the Sentencing Commission and designated by it as discouraged factors for departures. See USSG § 5H1.5 (employment); § 5H1.2 (education); and § 5H1.6 (family ties and responsibilities). Willey cites cases predating the PROTECT Act which were affirmed although

discouraged factors were among the reasons for a downward departure, but these were cases where the defendant was credited for acceptance of responsibility and there was no enhancement for obstruction. <u>See</u> <u>United States v. Decora</u>, 177 F.3d 676, 679-80 (8th Cir. 1999); <u>United States v. Big Crow</u>, 898 F.2d 1326, 1331-32 (8th Cir. 1990).

The circumstances in Willey's case are not of a kind or degree not adequately considered by the Commission in providing for discouraged factors. <u>See</u> USSG § 5K2.0. The discouraged factors and incomplete post offense rehabilitation are not enough to support a downward departure here. Accordingly, we reverse and remand for resentencing within the guideline range.

_____